IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

KIMBERLY SIMPSON                     :

                                 :

      v.                         :   Civil Action No. DKC 14-1968

                                 :

TECHONOLOGY SERVICE CORPORATION      :

                                 :

**MEMORANDUM OPINION**

Presently pending and ready for review in this employment discrimination action are two motions: (1) a motion for summary judgment filed by Defendant Technology Service Corporation (ECF No. 43-1); and (2) a motion to unseal Plaintiff's Exhibits 25 and 26 filed by Plaintiff Kimberly Simpson (ECF No. 57). The relevant issues have been briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, Defendant's motion for summary judgment will be granted and Plaintiff's motion to unseal will be granted without prejudice to Defendant, giving Defendant fourteen (14) days to file a properly supported motion to seal.

**I.   Background**

This case involves several retaliation and gender discrimination claims brought by Plaintiff Kimberly Simpson ("Plaintiff") against her employer, Technology Service Corporation ("Defendant" or "TSC"). Plaintiff, a woman, worked

at TSC for approximately 27 years from 1983 until 2011. (ECF No. 58-1, at 2).[1]  She held the position of Facilities Security Officer ("FSO") from her promotion in 1987 until the company terminated her employment.[2] (*Id.*).

## A.    Factual Background[3]

### 1.    Employment at Defendant's Navy Yard Location

In 2007, Defendant transferred Plaintiff from a Dahlgren, Virginia, facility to its Navy Yard office in Washington, D.C. (ECF No. 43-1, at 6-7).  During the relevant period of her employment at Defendant's Navy Yard location, Plaintiff worked as an FSO on Defendant's contract with the Navy for the Cobra Judy Replacement ("CJR") project.  (*Id*. at 7).  As an FSO, Plaintiff was responsible for securing and protecting classified information.[4]

---

[1] When citing to Plaintiff's opposition, this opinion will refer to ECF No. 58-1, which was re-filed not under seal on April 2, 2015.  Plaintiff had previously filed her opposition entirely under seal on March 11, 2015.  (*See* ECF No. 51).

[2] Elsewhere in her opposition, Plaintiff states that her promotion occurred in 1988.  (ECF No. 58-1, at 1).

[3] The following facts are uncontroverted, alleged by Plaintiff, or construed in the light most favorable to her.

[4] In her deposition, Plaintiff provided a description of her duties:  "I was responsible for all classified information protection, and the procedures, and managing the program."  (ECF No. 43-3, at 22).  Charged with protecting "hard copy classified documents, CDs, computers, [and] laptops," Plaintiff was also

In 2010, Plaintiff worked at the Navy Yard facility under the supervision of several TSC employees, some of whom had positions funded through Defendant's CJR contract. (*Id.*; ECF No. 58-1, at 3).   Matt Prenatt was Plaintiff's immediate supervisor and the team lead for TSC employees on the CJR contract.   Mr. Prenatt supervised Plaintiff and Atilla Horvath, Defendant's other employee on the CJR contract.   His supervisory responsibilities included reviewing their work and approving their time cards.   Defendant's Office Manager, Randy McQueen, was Plaintiff's second-level supervisor and not funded by the CJR contract.   Dave Schubert, TSC's VP/Division Director for Engineering and Technical Services, worked from Defendant's Silver Spring office and served as Plaintiff's third-level manager. (ECF No. 58-52 ¶ 6).

Plaintiff alleges that, while employed as an FSO on the CJR project, Defendant denied her the option to telework that was offered to her male colleague, Mr. Horvath. (ECF No. 58-1, at 3).   According to Plaintiff, TSC permitted Mr. Horvath to telecommute, a practice inconsistent with Defendant's "core hours" policy enforced by Mr. McQueen and applicable to employees working on the CJR contract. (*Id.*).   Plaintiff avers that she reported to Mr. McQueen and Mr. Prenatt that she felt

responsible for training others on information security protocol. (*Id.* at 23-24).

she was being treated differently from others and was "tired of this men's management." (*Id*. at 4).  She also asserts that, on or around January 8, 2010, she complained to Mr. McQueen, "[A]ll you men are against me." (*Id*.).  At the time, Plaintiff "was the lone woman working on the CJR program for Defendant." (*Id*. at 5).

Plaintiff asserts that, during a meeting with Mr. Prenatt on or around January 8, 2010, they discussed her time card and the option to telework.  (ECF No. 58-52 ¶¶ 7-8).  Alleging that she was being singled out, Plaintiff stated that she would follow up.  (ECF No. 58-1, at 4).  Several days later, on January 11, 2010, Plaintiff e-mailed Mr. McQueen and Mr. Prenatt:

> I can not work under this type of management.  I feel I am on a time clock and need to punch in and out with [M]att.  [I] am being question[ed] about working early hours and need a[n] explanation as to working offsite versus working from home.[] I would appreciate an office meeting so we can all be on the same page and I don't feel like I am being treated different than anyone else in the office.

(ECF No. 43-5, at 2).  Shortly thereafter, on or around January 11, 2010, Mr. McQueen and Mr. Schubert informed Plaintiff that the "government customer wanted [her] removed from the [CJR] contract" and that she would have several months to find a new position.  (ECF No. 58-52 ¶¶ 11-12).  In the interim, Defendant

allowed Plaintiff to look for another position, either within TSC or externally. (ECF No. 43-1, at 13). Defendant ultimately did not discharge Plaintiff in January 2010 or several months later, and she was informed that she could continue working as an FSO on the CJR contract until the government contractor transition was finalized. (*Id.* at 12). To aid in her search, Mr. McQueen provided Plaintiff with a letter of recommendation, dated January 15, 2010, stating the reasons for her departure: Defendant's "contract is being re-competed and the government is bringing in a civil servant to manage the program security effort." (ECF No. 58-14).

### 2. Removal from Defendant's Navy Yard Location and Continued TSC Employment at Dahlgren

Plaintiff continued working as an FSO at Defendant's Navy Yard location until late May 2010. During this time, Ms. Simpson also secured a Defendant-contracted position with the Navy's Air and Missile Defense Radar ("AMDR") program in Dahlgren, Virginia, due to her contacts within the government. (ECF No. 43-1, at 13). She began her AMDR assignment in approximately March 2010.[5] (*Id.*). No other TSC employees were based in the Dahlgren office in which Plaintiff worked. (*Id.*).

---

[5] Between approximately March and late May 2010, Plaintiff worked on both the CJR and AMDR contracts at Navy Yard and Dahlgren, respectively. (*See* ECF No. 43-1, at 12, 13 n.49).

On May 27, 2010, after Plaintiff had begun work at Dahlgren but while she continued to serve as an FSO at the Navy Yard location, a security breach occurred when a TSC employee moved a classified laptop computer from Defendant's Navy Yard office to the Silver Spring office. (*Id.*). Plaintiff was not present when Ted Mayberry, then the Deputy Operations Manager at Defendant's Silver Spring office, removed the computer. (ECF No. 58-1, at 6). Recognizing that this constituted a reportable security violation of Defense Security Service ("DSS") procedures, Plaintiff called to alert DSS of the breach. (ECF No. 58-52 ¶ 28). Immediately thereafter, Plaintiff and Defendant disputed whether she had followed company protocol in reporting the security violation. On or around May 28, 2010, Mr. McQueen met with Plaintiff and told her that she had circumvented company procedures. (*Id.* ¶¶ 36-37). Defendant argues that her actions were "contrary to the process established by the National Industrial Security Program Operation Manual ('NISPOM') and TSC's related practices," which call for "a preliminary inquiry *before* reporting a loss, compromise or suspected compromise." (*Id.* at 15) (emphasis in original). Plaintiff indicated to Mr. McQueen that she did not intend to follow protocol in the future and, at the conclusion of the meeting, Mr. McQueen informed Plaintiff that she would be removed as FSO for the Navy Yard office. (ECF Nos. 43-1, at 17-

18; 58-47, at 39).   Plaintiff allegedly replied, "[N]one of the men have my back."   (ECF No. 58-52 ¶ 38).   She also later testified that she believed her removal as Navy Yard FSO was directly related to the May 2010 security incident.   (ECF No. 43-4, at 36).

Upon being relieved of her FSO responsibilities, Plaintiff continued to work for Defendant on the AMDR contract at Dahlgren.   There, she worked on-site with government employees rather than in a TSC office.   As a result, Defendant argues, it asked Dario Llacuna, a TSC employee who also worked on the AMDR contract, to monitor Plaintiff's performance on Defendant's behalf.   (ECF No. 43-1, at 13-14).   Mr. Llacuna reported to Bob Blase, Defendant's technical lead on the AMDR contract.   Mr. Llacuna regularly checked in on Plaintiff beginning in or around April 2010, and Defendant "was not aware of any problems with Ms. Simpson's performance on the AMDR contract at Dahlgren." (*Id.* at 14).

### 3.   Cuts to the AMDR Program, Termination of Plaintiff's Employment, and Defendant's Decision to Name Mr. Mayberry as Silver Spring FSO

In early January 2011, while Plaintiff was employed on the AMDR contract at Dahlgren, Defendant's FSO at the Silver Spring office, Chris Hildebrand, resigned his position.   (*Id.* at 18). Defendant contends that, upon Mr. Hildebrand's resignation, Mr. Schubert "decided not to fund a distinct full-time position for

7

the FSO role at the Silver Spring [o]ffice, and instead designated [Mr.] Mayberry as FSO in his capacity as [Silver Spring] Deputy Operations Manager." (*Id.*). According to Defendant, the decision to assign FSO responsibilities to Mr. Mayberry was intended to save costs. (*Id.* at 19). Mr. Schubert "did not express any expectation that [Mr.] Mayberry would continue to serve as FSO permanently." (*Id.*).

In January 2011, Plaintiff received a termination letter from Defendant and learned that Mr. Mayberry had been assigned to take on the Silver Spring FSO responsibilities. (ECF No. 58-52 ¶¶ 51-52). Plaintiff alleges that she "was not made aware of any opportunity to apply formally for the Silver Spring FSO position at any time in 2011," even though she "had made [her] interest in positions within TSC known." (ECF No. 58-52 ¶¶ 53-54). The decision to designate Mr. Mayberry as the Silver Spring FSO was made prior to the termination of Plaintiff's employment, although the precise date on which Mr. Schubert decided to designate Mr. Mayberry the Silver Spring FSO is unclear.[6] (ECF Nos. 43-1, at 19; 43-7, at 18).

---

[6] There is some discrepancy concerning the date of Plaintiff's discharge. Defendant contends that it notified Plaintiff on January 13, 2011 that her employment would be terminated, with an effective date of January 28, 2011. (ECF No. 43-1, at 22). Plaintiff states that "[Mr.] Llacuna e[-]mailed me on January 14, and asked if I would meet him and [Mr.] Blase at the Dahlgren [o]ffice on Monday, January 17,

Defendant asserts that it learned in early January 2011 of the Navy's cuts to the AMDR program affecting Plaintiff's position at Dahlgren. (ECF No. 43-1, at 20). Defendant maintains, and Plaintiff disputes, that it "had no involvement in the AMDR program's underlying funding decisions and played no role in the decision to discontinue funding for Ms. Simpson's position." (*Id.*). The Navy initially informed Plaintiff that her funding on the AMDR program was being cut: "[Plaintiff's] government client, Brad Crane, advised [her] in early January 2011 that funding cuts were coming and [her] position was going to be abolished on the contract." (ECF No. 43-8, at 3). Mr. Schubert contacted the "TSC manager at Dahlgren to see if he had [a position available for Plaintiff], but he did not have anything for her." (ECF No. 58-51, at 131). Subsequently, Defendant terminated Plaintiff's employment with TSC. (ECF No. 43-1, at 22). Defendant's termination letter to Plaintiff, dated January 13, 2011, notes that "[t]his was an extremely difficult decision based entirely on loss of our AMDR funding under the EG&G contract and lack of suitable work." (ECF No. 58-3).

---

2011. . . . I had no idea that I was going to receive a termination letter." (ECF No. 43-8, at 3). Neither Plaintiff nor Defendant, however, dispute that the decision to designate Mr. Mayberry as Silver Spring FSO was made prior to Plaintiff's dismissal.

On January 24, 2011, Plaintiff e-mailed Defendant's then-President, Bob Graziano, to request a meeting.  The record is inconclusive as to whether any in-person meeting took place, but Plaintiff and Mr. Graziano seem to have spoken by telephone. Prior to their conversation, Mr. Graziano and Mr. Schubert e-mailed regarding the details of Plaintiff's discharge.  Mr. Schubert wrote:

> We were informed early in January that the AMDR program was taking cuts and could no longer support [Plaintiff] after the end of January.  She pretty much burned her bridges as a security officer, both at our Dahlgren office and at the Navy Yard.  She was also released from the Cobra Judy Replacement program last year for poor performance.  I lost confidence in her judgment as a[n] FSO when she reported a dubious security procedure with a laptop computer to DSS against my wishes and without consulting me.

(ECF No. 43-14, at 2).  Plaintiff asserts that, during their telephone conversation, "[Mr.] Graziano told [her] she was not 'qualified'" to serve as Silver Spring FSO, the position that had been reassigned to Mr. Mayberry.  (ECF No. 58-1, at 14).

### 4.   EEOC Filing and Defendant's Decision to Hire a New Silver Spring FSO

In May 2011, Plaintiff filed an Equal Employment Opportunity Commission ("EEOC") discrimination charge against Defendant, alleging discriminatory and retaliatory termination and failure to hire.  (ECF No. 58-12).

In or around June 2011, Mr. Schubert decided to search for a full-time Silver Spring FSO so that Mr. Mayberry could resume his former position with a focus on business development.[7] Around this time, Geraldine McGovern, a TSC employee who then served as the Navy Yard FSO, was losing funding coverage for her position.  (ECF No. 43-1, at 25).  Mr. McQueen suggested to Mr. Schubert that TSC transfer Ms. McGovern to the Silver Spring office to serve as FSO.  (*Id.*).  Plaintiff did not apply for the open FSO position, and Defendant did not consider Plaintiff for employment.[8]  (*Id.* at 26-27).  In October 2011, Defendant transferred Ms. McGovern to the Silver Spring office and, upon being relieved of his FSO responsibilities, Mr. Mayberry continued in his role as Deputy Operations Manager.  (*Id.* at 26).

**B.   Procedural History**

On May 11, 2011, Plaintiff filed Discrimination Charge No. 531-2011-01407 with the EEOC against Defendant, alleging gender

---

[7] Mr. Schubert explained in an attachment to Defendant's position statement to the EEOC, dated June 17, 2011: "I assigned [Mr. Mayberry] to fill in to handle these duties until we had the financial resources to bring on another full time [FSO].  We have started looking at candidates, both male and female, to fill this position, and hope to fill it in the fall of 2011." (ECF No. 58-9, at 7).

[8] After her dismissal, Plaintiff did not express an interest in further employment with Defendant.  (ECF Nos. 43-1, at 26; 43-3, at 39-40).

discrimination and retaliation. (ECF No. 58-12). Defendant received a copy of Plaintiff's EEOC charge on May 20, 2011. (ECF No. 58-9, at 6). Plaintiff commenced this action on May 1, 2014 in the Circuit Court for Montgomery County, Maryland, alleging discrimination and retaliation claims under Title VII. (ECF No. 2). On June 18, 2014, Defendant removed Plaintiff's action to this court based on federal question jurisdiction. (ECF No. 1). Plaintiff filed a two-count amended complaint against Defendant on August 29, 2014. (ECF No. 14-1). Defendant submitted its answer (ECF No. 15) and later amended its answer on December 12, 2014 (ECF No. 32). The court granted the parties' joint motion for entry of a stipulated protective order on December 1, 2014. (ECF No. 31).

On February 6, 2015, after the close of discovery, Defendant filed the pending motion for summary judgment. (ECF No. 43-1). Plaintiff responded in opposition filed entirely under seal on March 11, 2015. (ECF No. 51). Shortly thereafter, Plaintiff filed a corresponding motion to seal.[9] (ECF No. 54). Plaintiff's motion to seal was denied "without prejudice to the filing of a properly supported motion." (ECF

---

[9] Pursuant to the confidentiality order (ECF No. 31), Plaintiff moved to seal her opposition "because it contains documents that have been marked as 'confidential' and makes reference to such documents." (ECF No. 54, at 1).

No. 55, at 1). Defendant timely replied to Plaintiff's opposition on March 30, 2015. (ECF No. 56). Plaintiff subsequently re-filed her opposition on April 2, 2015.[10] (ECF No. 58-1). Also on April 2, 2015, Plaintiff filed the pending motion to unseal or, in the alternative, to redact or seal Plaintiff's Exhibits 25 and 26, which remain under seal. (ECF No. 57). Defendant has not responded to Plaintiff's motion to unseal.

## II. Defendant's Motion for Summary Judgment

### A. Standard of Review

A motion for summary judgment will be granted only if there exists no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008). Summary judgment is inappropriate if any material factual issue "may reasonably be resolved in favor of either party." *Liberty Lobby*, 477 U.S. at 250; *JKC Holding Co. LLC v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).

---

[10] Plaintiff kept two exhibits under seal and attached other exhibits with only minor redactions. (ECF No. 58 ("After consultation with the parties, redacted documents are being filed herewith in place of the original sealed exhibits and opposition, except for Exhibits 2[5] and 2[6].")).

The moving party bears the burden of showing that there is no genuine dispute as to any material fact. However, no genuine dispute of material fact exists if the nonmoving party fails to make a sufficient showing on an essential element of his or her case as to which he or she would have the burden of proof. *Celotex*, 477 U.S. at 322–23. Therefore, on those issues on which the nonmoving party has the burden of proof, it is his or her responsibility to confront the summary judgment motion with an "affidavit or other evidentiary showing" demonstrating that there is a genuine issue for trial. *See Ross v. Early*, 899 F.Supp.2d 415, 420 (D.Md. 2012), *aff'd*, 746 F.3d 546 (4th Cir. 2014).

## B. Analysis

Plaintiff's two-count complaint alleges retaliation and gender discrimination when, in both January 2011 and October 2011, Defendant failed to hire Plaintiff for the Silver Spring FSO position, and when Defendant terminated her employment in January 2011. Plaintiff's claims are brought under Title VII of the Civil Rights Act, which prohibits discrimination based on an employee's personal characteristics such as "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1); *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S.Ct. 2517, 2525 (2013). It also prohibits retaliation by the employer against employees who engage in a protected activity. 42 U.S.C. §

14

2000e-3(a).    Protected  activity  includes  opposing  "unlawful
employment  practice[s]  [under]  this  subchapter"  or  "ma[king]  a
charge,  testif[ying],  assist[ing],  or  participat[ing]  in . . .
[a Title VII] investigation, proceeding, or hearing[.]"  *Id.*

    To  survive  a  motion  for  summary  judgment,  a  plaintiff
asserting  Title  VII  claims  must  provide  evidence  of  intentional
discrimination  through  one  of  two  avenues  of  proof:   (1) direct
evidence  that  retaliation  or  protected  status  motivated  the
employer's  adverse  employment  decision;  or  (2)  the  *McDonnell*
*Douglas*  "pretext  framework"  requiring  a  plaintiff  to  establish  a
*prima  facie*  case  and  show  that  the  "employer's  proffered
permissible  reason  for  taking  an  adverse  employment  action  is
actually  a  pretext  for  [retaliation or discrimination]."   *Hill*
*v.  Lockheed  Martin  Logistics  Management,  Inc.*,  354  F.3d  277,
284-85  (4th Cir. 2004) (citing *McDonnell Douglas Corp. v. Green*,
411  U.S.  792  (1973)).   Direct  evidence  includes  "conduct  or
statements that both reflect directly the alleged discriminatory
attitude  and  that  bear  on  the  contested  employment  decision."
*Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 520 (4th Cir. 2006)
(internal  quotation  marks  omitted).    If  believed,  direct
evidence  "would  prove  the  existence  of  a  fact . . . without  any
inference  or  presumptions."   *O'Connor v. Consol. Coin Caterers*
*Corp.*,  56  F.3d  542,  548  (4th Cir. 1995) (citation and internal
quotation  marks  omitted),  *rev'd on other grounds*,  517  U.S.  308

(1996).   Plaintiff presents no direct evidence showing that Defendant terminated her employment due to unlawful retaliation or gender discrimination.   Thus, Plaintiff's discrimination claims must be examined using the burden-shifting framework established in *McDonnell Douglas*.[11]

The familiar *McDonnell Douglas* framework "'compensat[es] for the fact that direct evidence of intentional discrimination is hard to come by'" and "give[s] plaintiffs who lack direct evidence a method for raising an inference of discrimination." *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 318 (4th Cir. 2005) (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 271 (1989) (O'Connor, J., concurring in the judgment)).   Under *McDonnell Douglas*, once the plaintiff meets her initial burden of establishing a *prima facie* case for a Title VII violation, "the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Lockheed Martin*, 354 F.3d at 285.   If the employer meets this burden of production, "the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the employer's stated reasons 'were not its true reasons, but were a pretext'" for retaliation or discrimination.   *Id.* (quoting *Reeves v.*

---

[11] By using the *McDonnell Douglas* pretext architecture to frame her argument throughout her opposition (ECF No. 58-1), Plaintiff in effect concedes the absence of direct evidence supporting her claims.

*Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000)). According to the United States Court of Appeals for the Fourth Circuit, "[t]he final pretext inquiry merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination, which at all times remains with the plaintiff." *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010) (citation and internal quotation marks omitted).

## 1. Defendant's Failure to Hire Plaintiff

Plaintiff asserts in Count I of her amended complaint that she was not selected for the Silver Spring FSO position in January 2011 both because of gender discrimination and in retaliation for her prior complaints of discrimination. She further contends that she was not hired in October 2011 for the FSO position both due to gender discrimination and in retaliation for filing an EEOC complaint in May 2011.

### a. Defendant Assigned Silver Spring FSO Responsibilities to Mr. Mayberry in January 2011

In the discriminatory failure-to-hire context, Plaintiff must show "that (1) she is a member of a protected class; (2) her employer had an open position for which she applied; (3) she was qualified for the position; (4) she was rejected for the position under circumstance giving rise to an inference of unlawful discrimination." *Mackey v. Shalala*, 360 F.3d 463, 468

(4th Cir. 2004) (citation omitted).  Defendant concedes that Ms. Simpson, a female, is a member of a protected class.

Defendant disputes that Plaintiff can satisfy the second and fourth elements of her *prima facie* case concerning its failure to hire her in January 2011.  With respect to the second element, Defendant argues that Plaintiff has failed to demonstrate that the Silver Spring FSO position was open when she applied or sought to apply in January 2011.[12]  Defendant contends that when Mr. Hildebrand resigned from his position as the Silver Spring FSO, Mr. Schubert decided to designate Mr. Mayberry, then the Deputy Operations Manager, to absorb the FSO responsibilities into his current workload.  According to Mr. Schubert, Mr. Mayberry was to "take on [the Silver Spring FSO]

---

[12] Defendant focuses on when and whether the FSO position was open rather than the sufficiency of Plaintiff's application. Whether Plaintiff did enough to apply for the Silver Spring FSO position is a close question. *See Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 319 (4th Cir. 2005) (explaining that in the failure-to-promote context, an individual must demonstrate that he "applied for the position in question"). Such a showing is not onerous, however, as "the *McDonnell Douglas* framework only demands that a plaintiff seek to apply, rather than actually apply, to an open position." *Ferdinand-Davenport v. Children's Guild*, 742 F.Supp.2d 772, 780 (D.Md. 2010).

In her affidavit, Plaintiff recounts that "previously while working for TSC, I had made my interest for positions within TSC known and this was all that was required for me to do to receive consideration for the position." (ECF No. 58-52 ¶ 54). However, when asked whether she had submitted an application for any position at the Silver Spring office in January 2011, Plaintiff responded, "No.  I was not told to." (ECF No. 43-3, at 38).

duties as collateral duty for a short while until we could decide how to proceed with a new FSO." (ECF No. 43-3, at 140). Mr. Schubert indicated that this arrangement was temporary "and then somewhere down the line have a full-time FSO." (*Id.* at 142). Defendant draws on these facts to argue that, because Mr. Schubert designated Mr. Mayberry to assume the FSO position, Defendant therefore did not have an open FSO position in January 2011. Thus, Plaintiff cannot demonstrate that Defendant had an open position when she applied or sought to apply. Plaintiff concedes that "she sought to be considered for the [Silver Spring] FSO position *after* it was given to [Mr.] Mayberry." (ECF No. 43-7, at 18) (emphasis added). She confirmed the timeline of events in her deposition, pointing to a conversation with Laura Grieco as when she received her letter of termination, learned of Mr. Mayberry's designation, and expressed her desire to fill the position. (ECF No. 43-3, at 38). By the time Plaintiff expressed interest in the Silver Spring FSO position in January 2011, Mr. Schubert had already designated Mr. Mayberry as Mr. Hildebrand's replacement. Plaintiff fails to forecast sufficient evidence that Defendant had an open position for which she applied or sought to apply and, therefore, cannot satisfy the second element of her *prima facie* case.

For the same reasons, Plaintiff cannot establish that she was rejected under circumstances giving rise to an inference of unlawful discrimination, as is required by the fourth element of a *prima facie* discrimination case.  To create an inference of unlawful discrimination, Plaintiff "must *at least* demonstrate that her 'rejection did *not* result from the two most common legitimate reasons on which an employer might rely to reject a job applicant: an absolute or relative lack of qualifications or the absence of a vacancy in the job sought.'" *Moore v. Leavitt*, No. WDQ-04-2819, 2007 WL 5123539, at *4 (D.Md. Feb. 9, 2007) (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 358 n.44 (1977)) (emphases added).  As discussed above, Defendant did not have a vacant FSO position at its Silver Spring office when Plaintiff sought the job.  Defendant provides an additional legitimate reason for its decision to have Mr. Mayberry replace Mr. Hildebrand:  it was a cost-saving measure. By retaining his prior responsibilities and absorbing the FSO duties previously performed by Mr. Hildebrand, Mr. Mayberry "was able to . . . save the company a significant amount of overhead." (ECF No. 43-1, at 14).  Plaintiff has not undermined Defendant's reasoning or created an inference of discrimination sufficient to satisfy the fourth prong of a *prima facie* discrimination case.

20

The retaliation component of Plaintiff's claim fails for the same reasons. Under the first step of the *McDonnell Douglas* framework, Plaintiff must establish a *prima facie* case of retaliation under Title VII by showing that: (1) she engaged in a protected activity;[13] (2) in response, her employer acted adversely against her;[14] and (3) the protected activity was causally connected to the adverse action. *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 218 (4th Cir. 2007) (citing *Beall v. Abbott Labs.*, 130 F.3d 614, 619 (4th Cir. 1997)). "Although the plaintiff's burden is 'not onerous,' it nevertheless requires him to 'prov[e] by the preponderance of the evidence a *prima facie* case of discrimination.'" *Warch*, 435 F.3d at 515 (citations omitted). If there was no position for which she could have been selected, then there is no adverse action.

---

[13] Defendant vigorously disputes the first element, whether Plaintiff engaged in protected activity. In doing so, however, Defendant fails to acknowledge the context in which Plaintiff's complaints of unfair treatment were made, and, while thin, evidence that she made her assertions of disparate treatment known suffices.

[14] Unlike for a discrimination claim, a plaintiff need not establish an "ultimate employment decision" to make out her *prima facie* case of retaliation; rather, she must show only that the action would be seen as materially adverse through the eyes of a reasonable employee. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). Actions like "petty slights, minor annoyances, and simple lack of good manners" are insufficient to support a retaliation claim, even under this lower standard. *Id.*

Accordingly, Plaintiff cannot show either gender discrimination or retaliation in her non-selection for the temporary assignment of FSO duties in January 2011.

**b. Defendant Transferred Ms. McGovern to Serve as Silver Spring FSO in October 2011**

The Silver Spring FSO position was not filled by a TSC employee on a permanent basis until October 2011, well after Plaintiff left the employ of TSC. She did not apply for the position and was not considered for it. Plaintiff contends that her failure to apply is not fatal to a *prima facie* retaliation case, stating that she "was never informed that the position was vacant or that a selection was being made, and had no way of finding out." (ECF No. 58-1, at 47). This argument, however, is unavailing. Not only did Plaintiff fail to pursue employment with TSC after filing her EEOC charge in May 2011, but she concedes that she would not have pursued a position with Defendant even had she known of any TSC job openings. Plaintiff describes why she did not submit any employment applications to Defendant between May and October 2011: "I provided a discrimination claim against them in May . . . . Why would I apply for a job there?" (ECF No. 43-3, at 39-40). Plaintiff's admissions belie her contention that her protected activity was the but-for cause of Defendant's decision to hire someone else

in October 2011.[15]   Plaintiff also admits that she saw a job opening for a security position with a subsidiary of Defendant, but did not apply.   (*Id.* at 40).   She does not allege that Defendant in any way caused her not to apply.   (*Id.*). Furthermore, Plaintiff has presented no evidence other than her own subjective belief to demonstrate that her October 2011 non-selection resulted from her May 2011 EEOC charge.   A plaintiff's own self-serving opinions, absent anything more, are insufficient to establish a *prima facie* case.   *See Goldberg v. B. Green & Co.*, 836 F.2d 845, 848 (4th Cir. 1988).   At bottom, Plaintiff did not apply for the position, and she was not considered for the position.   *See Miles v. Jaczko*, No. DKC-2009-0503, 2010 WL 889793, at *10 (D.Md. Mar. 5, 2010) (holding that the causation element of a *prima facie* retaliation case is lacking when the plaintiff "did not submit an actual application").   Therefore, her retaliatory failure-to-hire claim fails.

Plaintiff's claim that Defendant failed to select her for the Silver Spring FSO position in October 2011 due to her protected status also fails.   (*See* ECF No. 14-1, ¶ 105).   As a

---

[15] The Supreme Court of the United States recently clarified that the plaintiff must ultimately prove that the alleged discriminatory action was the "but for" cause of the adverse employment action.   *Nassar*, 133 S.Ct. at 2533 (holding that "Title VII retaliation claims must be proved according to traditional principles of but-for causation").

threshold matter, and as discussed above, Plaintiff cannot demonstrate that she applied for the position. Defendant further contends that Plaintiff cannot show that "she was rejected for the position in favor of someone not a member of a protected group under circumstances giving rise to an inference of unlawful discrimination." *Agelli v. Sebelius*, No. DKC-13-497, 2014 WL 347630, at *4 (D.Md. Jan. 30, 2014) (citing *Alvarado v. Bd. of Trs. of Montgomery Cmty. Coll.*, 928 F.2d 118, 121 (4th Cir. 1991)). Here, Plaintiff is female. Defendant has presented undisputed evidence that, in October 2011, it transferred Ms. McGovern, also female, from the Navy Yard to Silver Spring in order for her to serve as FSO in a full-time capacity. (ECF No. 43-1, at 53). That the Silver Spring FSO position was filled by someone within her protected class negates an inference of gender discrimination and fatally undermines Plaintiff's ability to establish a *prima facie* case. *See Janey v. N. Hess Sons, Inc.*, 268 F.Supp.2d 616, 626 (D.Md. 2003); *Nash v. Hudson Belk Co.*, 232 F.3d 888, 2000 WL 1421329, at *1 (4th Cir. 2000) (holding that the plaintiff failed to establish a *prima facie* case of discrimination when the position plaintiff sought was not filled by someone outside the protected class).

2.    **Termination of Plaintiff's Employment**

In Count II of her amended complaint, Plaintiff contends that Defendant terminated her employment in January 2011 as a result of gender discrimination and in retaliation for her prior protected activity.

In the discriminatory termination context, Plaintiff must establish a *prima facie* case showing, in addition to other required elements, that her "position remained open or was filled by [a] similarly qualified applicant[] outside the protected class." *Lockheed Martin*, 354 F.3d at 285 (citation omitted).   Indeed, as a general rule in the Fourth Circuit, "Title VII plaintiffs must show that they were replaced by someone outside their protected class in order to make out a *prima facie* case." *Miles v. Dell, Inc.*, 429 F.3d 480, 486 (4th Cir. 2005).   Plaintiff attempts to satisfy this element of the *prima facie* case by declaring that the record "show[s] that she was replaced on the [Navy] contract by a man, Malcolm Clark." (ECF No. 58-1, at 20).   Plaintiff states, "The only subsequent change was that [Ms.] Simpson's funding was deleted and Malcom Clark was funded instead . . . ." (*Id.* at 13).   However, nothing in either Plaintiff's opposition or the record supports her contention that Mr. Clark was an employee of Defendant or that Defendant had anything to do with his assignment to the AMDR contract.   That Mr. Clark took a position funded by the

contract simultaneously with Plaintiff's removal does not mean that Defendant employed Mr. Clark, caused the elimination of Plaintiff's position, or "fabricated its own internal documents replacing [Ms.] Simpson in the funding" with Mr. Clark. (*Id.* at 28). Plaintiff's bald assertions are not supported by facts, as she cannot point to any documentation showing that Defendant employed Mr. Clark or agitated for either his addition to the AMDR contract or Plaintiff's removal. Similarly, Plaintiff offers no evidence that her position at TSC remained open or was filled by someone outside the protected class. Focusing inadvisably on the Navy's own employment decisions concerning the AMDR contract and attributing them to Defendant without substantiation, Plaintiff fails to satisfy her *prima facie* case.

Defendant challenges Plaintiff's *prima facie* retaliatory termination case on the ground that she has failed to establish a causal nexus. *See Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998) ("To survive summary judgment, therefore, [Plaintiff] must have evidence from which a reasonable factfinder could conclude that a causal connection exists between the protected activity and the adverse action."). Given the long gap between Plaintiff's asserted protected activity and the adverse employment action, it is

unlikely that she can establish a causal nexus.[16]   *See id.*
(citations omitted) ("A lengthy time lapse between the employer
becoming aware of the protected activity and the alleged adverse
employment action . . . negates any inference that a causal
connection exists between the two."). However, even if
Plaintiff were able to support a *prima facie* retaliation case,
or indeed, a gender discrimination case, Defendant also offers
legitimate, nondiscriminatory reasons for its decision to
terminate Plaintiff's employment. Defendant asserts that it had
no involvement in the AMDR program's underlying funding
decisions and played no role in the decision to cut funding for
Plaintiff's position. (ECF No. 43-1, at 44-45). After learning
of the funding cuts, Mr. Schubert explored other potential
employment opportunities for Plaintiff, but the TSC manager at
Dahlgren "did not have anything for her." (ECF No. 58-51, at
131). According to Plaintiff's termination letter, she was
fired "based entirely on [the] loss of . . . AMDR funding . . .
and lack of suitable work." (ECF No. 58-3). As Mr. Schubert
described, it was not unusual for Defendant to discharge

---

[16] Although Plaintiff does not include Defendant's alleged
January 2010 "initial firing attempt" as an adverse employment
action in the counts of her amended complaint, she references
this event to demonstrate causation, *i.e.*, as evidence of
Defendant's recurring retaliatory animus and pretext. (ECF No.
58-1, at 33-35). Plaintiff, however, offers only conclusory
remarks tying Defendant's "initial firing attempt" to her
January 2011 non-selection and discharge.

employees due to government funding decisions: "[W]e have taken funding cuts to many projects and had to lay[]off many people all the time I have been a TSC manager." (ECF No. 58-51, at 130). The record establishes convincingly that Defendant had legitimate, nondiscriminatory reasons for dismissing Plaintiff.

Plaintiff, meanwhile, has failed to show that Defendant's legitimate, nondiscriminatory reasons for its actions are merely a pretext for underlying discriminatory or retaliatory behavior. When an employer articulates a legitimate, nondiscriminatory basis for its action, courts are not to "decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the [adverse employment action]." *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 279 (4th Cir. 2000). "To show pretext, a plaintiff must proffer sufficient evidence such that a reasonable trier of fact could conclude that the employer's explanation is false or unworthy of credence, *and* that discrimination or retaliation was the true reason for the adverse employment action." *Hart v. Lew*, No. ELH-12-03482, 2015 WL 521158, at *23 (D.Md. Feb. 6, 2015) (emphasis added) (citations and internal quotation marks omitted).

Here, Plaintiff's various arguments attributing unlawful motives and obfuscation to Defendant are insufficient to establish pretext. *See Goldberg*, 836 F.2d at 848 (acknowledging that the plaintiff's own opinions and conclusory allegations

lack sufficient "probative force to reflect a genuine issue of material fact"). Plaintiff advances unsubstantiated arguments that Defendant decided to remove her from the AMDR program, that no documents indicate the Navy's desire to have Plaintiff removed, and that "[w]hether the Navy in fact cut [her] funding or position is hotly disputed." (*See* ECF No. 58-1, at 12). She further contends that Defendant's multiple explanations for the January 2011 adverse employment actions "reveal[] the defense as fabricated," or pretextual. (*Id.* at 39); *see Alvarado*, 928 F.2d at 122-23 (holding that the plaintiff demonstrated pretext by showing that the employer had offered multiple, inconsistent justifications for its adverse employment action). However, Plaintiff "has not demonstrated such weaknesses, implausibilities, or inconsistencies in [Defendant's] proffered reasons for [her] removal that a reasonable fact-finder could find those reasons unworthy of credence. Nor has she offered other forms of circumstantial evidence sufficiently probative of retaliation." *Romeo v. APS Healthcare Bethesda, Inc.*, 876 F.Supp.2d 577, 589-90 (D.Md. 2012) (citation and internal quotation marks omitted). Plaintiff also asserts generally that Mr. Schubert's anger is evidence of retaliatory animus, but she does not set forth specific facts supported by the record or

personal knowledge.[17]   (*See* ECF No. 58-1, at 37).   The record contradicts or fails to support Plaintiff's assertions. Accordingly, she cannot show that Defendant's legitimate, nondiscriminatory reasons are merely a pretext.   No reasonable jury could conclude by a preponderance of the evidence that Plaintiff's January 2011 discharge occurred due to unlawful discrimination or in retaliation for protected activity. Summary judgment will be entered in favor of Defendant on Count II.

### III. Plaintiff's Motion to Unseal

Plaintiff responded to Defendant's motion for summary judgment by filing her opposition and supporting documentation entirely under seal, without an appropriate motion.   (ECF No. 51).   When notified that her opposition was filed incorrectly (ECF No. 52), Plaintiff subsequently filed a motion to seal pursuant to a confidentiality order between the parties "because [her opposition] contains documents that have been marked as 'confidential' and makes reference to such documents" (ECF No.

---

[17] Rule 56 does not require the district court to scour the record in search of evidence to support a litigant's claims on summary judgment.   *Malina v. Baltimore Gas & Elec.*, 18 F.Supp.2d 596, 604 (D.Md. 1998) (citations omitted) ("[I]t is the responsibility of the plaintiff, not the court, to identify with particularity the evidentiary facts existing in the record which can oppose the defendant's summary judgment motion.   The court . . . is not required to independently comb the record to look for them.").

54, at 1).   The next day, Plaintiff's motion to seal was denied "without prejudice to the filing of a properly supported motion." (ECF No. 55, at 1).   Shortly after Defendant filed its reply (ECF No. 56), Plaintiff re-filed her opposition largely not under seal (ECF No. 58-1).   After consultation with Defendant, Plaintiff redacted portions of her supporting documentation but kept Plaintiff's Exhibits 25 and 26 under seal.   Simultaneously, Plaintiff filed the pending motion to unseal or, in the alternative, to redact or seal Plaintiff's Exhibits 25 and 26.   (ECF No. 57).   Defendant has not responded to Plaintiff's motion to unseal.

At issue in any request to seal are the principles of common law access and the more rigorous First Amendment analysis that applies to judicial records.   The First Amendment test for access to judicial records extends to "'dispositive' civil motions, such as a motion for summary judgment that is successful *either in full or part*." *Allstate Ins. Co. v. Warns*, No. CCB-11-1846, 2012 WL 681792, at *17 (D.Md. Feb. 29, 2012) (emphasis added); *Rushford v. New Yorker Magazine, Inc.*, 846 F.2d 249, 252 (4th Cir. 1988).   The Fourth Circuit also recently remarked in *In re U.S. for an Order Pursuant to 18 U.S.C. Section 2703(D)*, 707 F.3d 283 (4th Cir. 2013), that "documents filed with the court are 'judicial records' if they play a role in the adjudicative process, or adjudicate substantive rights."

31

*Id.* at 290.  Here, a motion to seal must comply with Local Rule

105.11, which provides:

> Any motion seeking the sealing of pleadings, motions,
> exhibits or other papers to be filed in the Court
> record shall include (a) proposed reasons supported by
> specific factual representations to justify the
> sealing and (b) an explanation why alternatives to
> sealing would not provide sufficient protections. The
> Court will not rule upon the motion until at least 14
> days after it is entered on the public docket to
> permit the filing of objections by interested parties.
> Materials that are the subject of the motion shall
> remain temporarily sealed pending a ruling by the
> Court.  If the motion is denied, the party making the
> filing will be given an opportunity to withdraw the
> materials.

This rule endeavors to protect the common law right to inspect

and copy judicial records and documents, *Nixon v. Warner*

*Commc'ns, Inc.*, 435 U.S. 589, 597 (1978), while recognizing that

competing interests sometimes outweigh the public's right of

access, *In re Knight Publ'g Co.*, 743 F.2d 231, 235 (4th Cir.

1984).

At present, there is no properly supported motion to seal

pending.  Moreover, it is unclear whether either party supports

sealing the exhibits in question, in whole or in part.  The

existence of the exhibits is mentioned in the motion papers, but

most of the contents are not.  The protective order entered with

the consent of both parties recites that: "The burden of proving

the Confidentiality of designated information remains with the

party asserting such Confidentiality."  (ECF No. 30-1, at 7).

Although Defendant has not opposed Plaintiff's motion to unseal, Plaintiff's motion suggests that Defendant has provided some justification as to why Exhibits 25 and 26 should remain under seal.  To the extent that Defendant wishes to have Plaintiff's Exhibits 25 and 26 remain under seal, in whole or in part, it must file a motion to seal that comports with Local Rule 105.11 within fourteen (14) days.  *See Marks v. Dann*, No. DKC-13-0347, 2013 WL 8292331, at *15 (D.Md. July 24, 2013), *aff'd*, 600 F.App'x 81 (4th Cir. 2015).  If no such motion is filed, the exhibits will be ordered unsealed at that time.

On the other hand, Plaintiff's redactions throughout the documentation supporting her opposition are reasonable and narrowly tailored to maintain the confidentiality of sensitive information belonging to the Navy and DSS, while permitting the public to view the information relevant to the current dispute. (*See* ECF Nos. 58-16; 58-17; 58-18; 58-26; 58-27; 58-28; 58-29; 58-30; 58-31; 58-32; 58-33).  This type of information may appropriately remain redacted.  *See Sky Angel U.S., LLC v. Discovery Commc'ns, LLC*, No. DKC-13-0031, 2015 WL 1393559, at *17 (D.Md. Mar. 24, 2015); *Pittson Co. v. United States*, 368 F.3d 385, 406 (4th Cir. 2004) (affirming decision to seal certain "confidential, proprietary, commercial, or financial data" that was produced under a protective order).

33

## IV.  Conclusion

For the foregoing reasons, the motion for summary judgment filed by Defendant Technology Service Corporation will be granted.  Plaintiff's motion to unseal Exhibits 25 and 26 will be granted without prejudice, and Defendant will have fourteen (14) days to file a motion setting forth its position regarding sealing.  A separate order will follow.


_____/s/_____
DEBORAH K. CHASANOW
United States District Judge

34